## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MONTE A. INGRAM, JR.,  # 550827     *

                 # 428839     *

Plaintiff,     *

    *

v.     *           Civil Action No.  WDQ-14-561

    *

WARDEN,     *

CONMED HEALTHCARE MANAGEMENT, *

  INC.     *

    *

Defendants.     *

        ***

### MEMORANDUM OPINION

Self-represented plaintiff Monte A. Ingram, Jr. sued Defendants "Warden" (Deborah Richardson, Director of the Baltimore County Detention Center)[1] and Conmed Healthcare Management, Inc. ("Conmed") under 42 U.S.C. §1983[2] for violating his Eighth Amendment rights. Richardson[1] has filed an Answer seeking dismissal of the Complaint and a Motion for Summary Judgment. (ECF 23, 37).  Conmed has filed a Motion to Dismiss (ECF 24), to which Ingram filed an opposition. (ECF 26).  Ingram also filed a Motion for Summary Judgment (ECF

---

[1]  The Clerk will be directed to amend the docket to reflect the proper name and title of "Warden" as Deborah Richardson, Director of the Baltimore County Detention Center.

[2] Under § 1983,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (2012).

27) to which Richardson and Conmed filed oppositions (ECF 28, 29) and Ingram replied. (ECF 30).[3]   No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014).

## BACKGROUND

Ingram was a prisoner at the Baltimore County Detention Center ("BCDC") from February 12, 2014 until July 3, 2014, when he was sent to the Maryland Reception, Diagnostic and Classification Center ("MRDCC") (ECF 28; 29-2; 37-1, p. 2).[4]

On February 25, 2014, Ingram filed a letter stating that he was being denied medical treatment for a broken thumb,  cracked left rib, and hernia. (ECF 1).  Further, he asserts that he was "forced in a cell" with a member of prison gang Dead Man Incorporated ("DMI"), despite it being known that Ingram purportedly has "a beef" with DMI. (ECF 1, p. 1). He also claimed that he was attacked by his cellmate, and he banged on the cell door numerous times until correctional officers responded.  He contends a correctional officer issued a "ticket" to "cover himself" after the incident. *Id.*  Ingram conetnds he was improperly placed in lock-up segregation without a mattress after the assault. *Id.*  He asked the Court to send him a §1983 form so that he could initiate suit. *Id.*  A §1983 form was sent to him by the Clerk.

On April 23, 2014, Ingram filed a Complaint naming "CMS"[5]  as a defendant which focused almost entirely on his hernia.[6]  In the Complaint, Ingram alleges that he has a hernia and

---

[3]   Also pending is Ingram's Motion for Appointment of Counsel. (ECF 34).  Ingram , a frequent *pro se* litigator in this court, has adequately presented his claims and  does not present circumstances warranting appointment of counsel. 28 U.S.C. ' 1915(e) (1); *see also Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1984) (authorizing appoint counsel if an indigent plaintiff presents exceptional circumstances).  Accordingly, the Motion will be denied.

[4]  Ingram was incarcerated at BCDC on four occasions:  December 14, 2012 to January 24, 2013; March 16, 2013 to September 18, 2013; December 12, 2013; and February 11, 2014 to July 3, 2014. (ECF 37-1, p. 2).  He is presently housed at North Branch Correctional Institution in Cumberland, Maryland.

[5]  The Court assumed that Ingram intended to name the medical provider for inmates at BCDC, which is Conmed, and directed service to proceed accordingly.

2

he

medical staff refused him an operation and denied him "T-3."[7] (ECF 2).[8]  He alleges that the medical staff has done nothing for his hernia or his pain. *Id.*  As redress, Ingram seeks $18,000 damages for denial of medical treatment and an "operation granted befor [sic] I can never have kids. (ECF 2, p. 3). [9]

On April 30, 2014, the Court ordered Plaintiff to provide additional information, including the names of prison staff who allegedly denied him access to medical treatment and to explain how his hernia condition had changed since 2011,[10] whether he had submitted sick call request slips or tried to access the Detention Center's administrative remedy process, details of how he tried to warn prison officials that he was in a cell with a known gang member, whether his cellmate had threatened him prior to the assault, the names of the prison officials he tried to warn, the injuries he sustained in the assault and whether he received treatment, and why his placement in segregation and lockup housing was improper. (ECF 5).

On May 8, 2014, Ingram supplemented the Complaint, stating that on March 21, April 1, April 5, and April 21, 2014, he was not seen by a Conmed doctor.  (ECF 6). He alleges that Conmed staff refused to give him an operation. *Id.*  He listed the names of a "Dr. L and a P.A., T.

---

[6]  Ingram attached to the Complaint copies of Inmate Complaint Forms he had submitted concerning his fear of DMI, difficulty receiving mail, hernia pain, failure to call him for medical visits, and a copy of the incident report written after his fight with inmate Daniel Brooks. (ECF 6-1).

[7]  Conmed explains that "T-3" is Tylenol 3 which is Tylenol with codeine. (ECF 24-1, n. 2).

[8]  Ingram does not mention either his broken thumb or cracked ribs in the Complaint.  As he did not particularize these claims, which are not addressed by Conmed, these claims will be dismissed without prejudice.

[9]  Ingram indicates he had surgery to "fix" his hernia after he was transferred from BCDC. (ECF 27, pp. 4, 9).  Thus, it appears his request for injunctive relief may be  moot.

[10]  Ingram's previous complaints of inadequate care for his hernia were reviewed in *Ingram v. Majd Arnaout, et al.*, Civil Action No WDQ-11-1841 (D. Md. 2011).

Jones and Noel." [11] *Id.* at 3.   He alleges that Jones refused to send him to a hernia specialist or

provide an operation for him, and reiterated generally that he was denied T-3 for pain relief. *Id.*[12]

On August 27, 2014, the Court directed Conmed and the Warden of BCDC to respond to

Ingram's claims of inadequate medical treatment, failure to protect, and improper assignment to

segregation housing. (ECF 14).

On October 20, 2014, Richardson filed an answer generally denying liability and raising

a number of affirmative defenses including qualified immunity. (ECF 23).

On October 21, 2014,  Conmed  filed a Motion to Dismiss with supporting affidavits and

262 pages of Ingram's medical records. (ECF 24-2, 24-3).

On November 17, 2014, Ingram filed a Response and a Motion for Summary Judgment.

(ECF 26, 27).  In the Response, he contends that he had provided the name of medical providers

who denied him surgery for his hernia. (ECF 26).  He generally asserts that "Dr. El-Baudi"[13] and

"P.A. Jane" denied him treatment.  He further asserts he now has only one testicle "due to the

fact that my hernia set [sic] in my scrotal sack for so long it cause [sic] a contusion in my right

groin." *Id.* at  3.

In his Motion for Summary Judgment, Ingram contends the treatment or lack of treatment

he received at BCDC (failure to send him for an outside consultation or provide him with

surgery) constituted cruel and unusual punishment in violation of his rights under the Eighth

Amendment. (ECF 27).  He avers that when he was at BCDC his "hernia set [sic] inside his

---

[11]  Ingram's pleadings are often difficult to discern. Conmed indicates he likely refers to nurse practitioners
Tyronnia Jones and Noel Stevens.  Conmed indicates "Dr. L" is likely  Dr. Khalid El Bedawi, M.D. (ECF 24-1, nn
5, 6; ECF 24-3).

[12]  Ingram has not amended the Complaint to include individual health care providers as Defendants.  For reasons set
forth herein, even had he named individual medical providers as defendants, his allegations fail to amount to a
constitutional claim.

[13]  The Court assumes Ingram was referring to Khalid El Bedawi, M.D.

strotum [sic] sack [sic], crushing my right testicle causing very, very bad swelling." (ECF 27, p.

6). He asserts his condition worsened from "stage 3 to stage 4" [14] and he developed a contusion

in his groin which caused him "unbelievable" pain. (ECF 27, pp. 2, 5). Ingram states he was

instructed by Dr. L and P.A. Jones to wear a hernia belt. (ECF 27, p. 3). According to Ingram, "I

stated I can't where [sic] a hernia belt...." *Id.*

Ingram contends that after he left BCDC other medical providers recommended hernia

repair surgery for him. Ingram asserts that when he was housed at MRDCC, Dr. Chhunchhia

Virenda sent him to Bon Secours Hospital. (ECF 27-1, p. 2). Also, in July of 2014, Dr. Agawar

at MRDCC recommended repairing the hernia as soon as possible (ECF 27, pp. 4, 6). In August

of 2014, Dr. Obsu at Brockridge Correctional Institution told him that his hernia required

immediate repair. (ECF 27, pp. 5-6). Ingram seems to assert that he had hernia surgery after he

left BCDC (stating he had a "hernia fix" when he was at North Branch Correctional Institution).

(ECF 27, p. 4). However, he does not specify when or where the surgery was performed, and no

documentary evidence is in the record.

Ingram has filed a copy of his medical record from his August 22, 2014 hospital visit to

Bon Secours Hospital, showing that Walesia Robinson, M.D. examined and diagnosed him as

having a groin contusion. (ECF 27-2). Ingram was prescribed doxycycline and Percocet, and

discharged the same day.

Ingram's admission to Bon Secours occurred nearly two months after he was transferred

out of BCDC, and the record of his hospital admission fails to substantiate Ingram's claim that

Dr. Robinson recommended surgery for him "ASAP." (ECF 27, p. 3). Further, he provides no

documentary support for his claims that other physicians recommended surgery for his hernia

---

[14] Ingram does not explain the meaning of "stage 3 to stage 4," and his medical records in evidence do not corroborate his self-reported diagnosis.

condition. Thus, apart from his own conclusionary statements, Ingram offers no corroboration

for his statement that his hernia condition worsened during the time he was incarcerated at

BCDC.  Most notably, Ingram does not provide a declaration in support of his allegations.

Conmed filed an Opposition to Ingram's Motion for Summary Judgment on December 1,

2014, contending that Ingram has failed to allege any facts to support a claim against Conmed or

any an individual health provider. (ECF 28).  Conmed asserts that Ingram received conservative

medical care for his hernia condition while at BCDC, and that his pleadings failed to establish a

claim of constitutionally inadequate medical care. (ECF 28, 24-3).

### A.  Conmed's Exhibits

Conmed has filed copies of Ingram's medical records demonstrating that he was

examined and diagnosed as having a reducible hernia,[15] for which he was prescribed a hernia belt

and Tylenol for pain.  (ECF 24-3, pp. 66. 108).  Ingram declined to use a hernia belt. *Id.* at 108,

112, 130.  The record shows that he complained numerous times about his hernia during his

incarceration at BCDC. *See e.g.*, ECF 24-3, pp. 80-83, 190.[16]  On April 3, 2014, Ingram

reported to Olubunmi Akinsanya, CRNP that he did not know why his T3 was stopped and

reported his hernia pain as 10 out of 10.  He refused Tylenol and Iburopen, stating he was

allergic to the medications. *Id* at 81.

The record indicates medical providers examined Ingram and also tried to educate him

about his hernia condition. A note written by Noel Stevens, CRNP on Ingram's medical record

dated May 3, 2014, reads in part:

---

[15] Conmed explains a reducible hernia returns to its normal position when lying down.  A reducible hernia is distinguished from an incarcerated or strangled hernia where the hernia becomes trapped in the abdominal wall and cannot return to its normal position. (ECF 28-1, n. 2; ECF 24-4, pp. 1-2).

[16] The medical records also show Ingram on occasions refused his medications or opportunities for medical visits concerning his hernia as well as other unrelated conditions.  (ECF 24-3,  pp. 72, 75, 88, 97, 98, 99, 101-103, 110-112, 123, 128-129, 130-133, 135, 139).

> Also IM still c/o right groin pain from his hernia. U/S ordered.  Medical Records
> from UMMC show started in 9/20/13.  Tried to explain to IM that incarcerated
> hernia is a surgical emergency that non-reducible hernia is not a surgical
> emergency.  IM was beligerent [sic] and reluctant to listen.

*Id*. at 92.

On May 5, 2014, Ingram was referred by Khalid El Bedawi, M.D. for a scrotal

sonogram. *Id*. at 65. The sonography report found a right inguinal hernia, bilateral varicoceles,

and bilateral hydroceles. *Id.* Dr. El-Bedawi's note from Ingram's follow up visit with him states:

> Patient has referral to urology on 5/9/14, initially was denied as it is elective
> procedure.  Patient understand [sic] and comprehend [sic].  Exam show [sic] right
> inguinal hernia reducible no incarceration or strangulation. His ultra sound
> scrotum done on 5/7/14. Impression right inguinal hernia, bilateral small
> varicoceles. Bilateral small hydroceles. Continue use hernia belt as needed and
> continue care plan.

*Id*. at 66; *see also* ECF 24-3 p. 89.

On May 11, 2014, Ingram submitted a sick call request for pain.  He wrote "it [sic] a

shame I half [sic] to sue for operation. But it the way it is" *Id*. at 74.  In response, Ingram was

advised that a urology consultation had been requested by Dr. El-Bedawi.  *Id.* [17]

On May 14, 2014, Ingram described his pain to Azizat Adeyiga, R.N. as like "testicles

sitting in hot water" and rated his pain as a 5 on a scale of 10.  He was prescribed 500 mg. of

Tylenol twice daily for five days and instructed to return if his pain worsened. *Id*. at 80.

### B. Director Richardson's Exhibits

On  December 4, 2014,  Richardson filed an Opposition to Plaintiff's Motion for

Summary Judgment. (ECF 29).[18]  Richardson argues that, as a nonmedical correctional official,

---

[17]  Richardson's exhibits indicate that on May 13, 2014,  Dr. Ruby,  Medical Director for "CCS," questioned the
urology referral. The record does not otherwise identify "CCS." Dr. Ruby opined that generally hydroceles and
varicocoeles do not require surgery, and questioned whether the hernia is reducible. (ECF 37, p. 8; ECF 37-2).  On
May 20, 2014,  Dr. El-Bedawi withdrew his request for an outside urology consult for Ingram.  *Id.*

[18]  As counsel notes, it is unclear whether Ingram's Motion was filed against  Conmed,  Richardson,  or both. (ECF
29, p. 3).

she was entitled to rely on the judgment of the medical providers who treated Ingram. Additionally, she avers that Ingram did not allege any facts to support a claim that BCDC staff failed to protect him, by knowingly placing him in a vulnerable situation with another inmate or improperly placing him in lock-up segregation. (ECF 29-1). On May 12, 2015, Richardson filed a Motion for Summary Judgment (ECF 37).

The exhibits filed in support of the Motion for Summary Judgment include an affidavit executed by Thomas Fitzgerald, Deputy Director of the BCDC. He attests that on February 11, 2014, Ingram began a period of incarceration at BCDC.  On February 13, 2014, Ingram advised the BCDC classification officer that he had no known enemies in the facility, no gang affiliation, and did not require protective custody. (ECF 37-4, p. 8).  On February 16, 2014, Ingram and inmate Daniel Brooks argued, and an order to keep both inmates separated was issued and remained in effect until Ingram was released.  *Id*. at 8.

Deputy Director Fitzgerald attests two additional "keep separate" orders and one "do not house together" order were issued involving two other inmates to ensure Ingram's safety and that of other inmates during this period. *Id*.  Prior to these events, Ingram had not informed BCDC staff there was a problem with these inmates. *Id*.  On March 13, 2014, Ingram expressed fear he was in danger of altercations with members of DMI, and he was moved the same day to a protective custody cell. *Id*.

Additionally, Deputy Director Fitzgerald attests that between February 11, 2014 and July 3, 2014, a period of 141 days,  Ingram spent more than 100 days in disciplinary segregation. *Id*. at 4-6. The remaining time was spent in general population, protective custody, and administration segregation housing. *Id*.  On February 16, 2014,  Ingram was transferred for 15 days from intake housing to disciplinary segregation for destruction of BCDC property,

8

threatening staff, and failing to comply with BCDC rules.  He received an additional ten days of disciplinary segregation for fighting with another inmate. *Id.* at 5.  On March 13, 2014, Ingram was moved from the general population to protective custody when he informed BCDC staff that he feared for his life due to gang activity.  On March 31, 2014, Ingram was removed from protective custody at his request.  He was then sent to medical housing for hernia pain. *Id.*

On April 3, 2014, Ingram was cleared by medical staff to return to the general prison population. On April 7, 2014, he failed to obey a correctional officer and was sent to disciplinary segregation. *Id.*  Ingram remained in disciplinary segregation until his transfer out of BCDC due to incidents of threatening staff, possession of contraband, failure to obey officers, and refusing offers to transfer to administrative housing. *Id.* at 5-6.

## ANALYSIS

### I.    LEGAL STANDARD

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir.1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

9

Ingram was provided notice of both Defendants' dispositive motions and an opportunity to respond with verified exhibits and declarations consonant with the holding in *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975) (holding *pro se* plaintiffs should be advised of their right to file responsive material to a motion for summary judgment). (ECF 25, 38). He replied to the dispositive pleadings and filed a Motion for Summary Judgment in response. (ECF 24, 26, 27). It is therefore appropriate to consider the pleadings and extraneous materials submitted by Conmed and Richardson as requesting summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The Court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  At the same time, the Court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Boucha*t, 346 F.3d at 526 (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)) (internal quotation marks omitted)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).   When cross motions for

summary judgment are filed, "each motion must be considered individually, and the facts

relevant to each must be reviewed in the light most favorable to the nonmovant."   *Mellen v.*

*Bunting*, 327 F.3d 355, 363 (4th Cir. 2003) (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th

Cir. 2003)).

## DISCUSSION

### I.   Claims Against Conmed

To the extent the Complaint names Conmed as a defendant based solely upon vicarious

liability, circuit law is clear.  A private corporation is not liable under § 1983 for actions

allegedly committed by its employees when such liability is predicated solely upon a theory of

respondeat superior.[19] *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir.

1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).  Further, Ingram does

not allege, nor does the record suggest, that Conmed is culpable under a theory of supervisory

liability. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (outlining requirements for

finding supervisory liability under § 1983).  Even if the claims against Conmed were to proceed,

Conmed is entitled to summary judgment in its favor and against Ingram on the merits.

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue

of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).[20]  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized

---

[19] *Respondeat superior* is a legal doctrine whereby an employer may be held responsible for its employees or agents.

[20]  It is unclear whether Ingram was a pretrial detainee or serving a sentence of conviction while at BCDC. The standard for reviewing medical claims of pretrial detainees under the Fourteenth Amendment is essentially the same as that for a convicted prisoner under the Eighth Amendment—deliberate indifference to serious medical needs. *Hill*

by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or its failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the United States Court of Appeals for the Fourth Circuit recently explained in *Lightsey*, 775 F.3d at 178, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."

Therefore, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. The Fourth Circuit has characterized this as an "exacting standard. . . ." *Id.* Moreover, in a case involving a claim of deliberate indifference to a serious

---

*v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992); *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (*citing Estelle v. Gamble*, 429 U.S. 97 (1976)).

medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). The serious nature of Ingram's medical condition is not in dispute. Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105; *see Makdessi v. Fields*, No. 13-7606, 2015 WL 1062474, at \*6 (4th Cir. March 12, 2015). And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence. . . ."

*Makdessi*, 2015 WL 1062474, at *6 .

Of import here, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (*citing Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Wester Jones*, 554 F.2d 1285 (4th Cir. 1979). Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. The right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977). Moreover, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

Conmed contends it is entitled to summary judgment in its favor because Ingram has not established deliberate indifference to a serious medical need. Conmed relies on Ingram's medical records which show he received examinations, a sonogram, and treatment at BCDC for a reducible hernia. That treatment consisted of the use of a hernia belt and analgesics. The record also reveals Ingram was not compliant with the conservative regimen recommended and refused to use a hernia belt. Ingram provides no documentary evidence to corroborate that his allegation that his condition progressively worsened at BCDC.

14

Viewing Ingram's allegations in the light most favorable to him, these assertions do not demonstrate that Conmed or its medical providers acted with deliberate indifference to his medical needs. Clearly, Ingram disagreed with the diagnosis and care he received at BCDC, and perhaps medical providers may have misdiagnosed his hernia condition.[21] Nevertheless, the record shows that Ingram's complaints were evaluated, he received a sonogram to evaluate his condition, a urology consultation was ordered, the nonemergency nature of his condition was explained, and he was prescribed a hernia belt and analgesics. This treatment belies Ingram's claim of deliberate indifference, and does not support an Eighth Amendment claim for inadequate medical care. Accordingly, Conmed is entitled to summary judgment in its favor. [22]

**Claims against Richardson**

Ingram does not allege that Richardson personally participated in of the matters alleged in the Complaint. As explained above, without either personal participation or grounds for supervisory liability, there can be no valid § 1983 claim.

Insofar as Ingram may fault Richardson for failing to attend to his medical concerns regarding the treatment of his hernia, he does not demonstrate deliberate indifference. As discussed above, the record shows Ingram's treatment for his hernia does not demonstrate deliberate indifference to his medical needs. Moreover, prison officials are entitled to rely on medical judgments and the expertise of prison physicians and other medical providers concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating

---

[21] The Court does not so find and expresses no opinion in this regard.

[22] Ingram contends that summary judgment in his favor is merited because his treatment (or lack thereof) constituted cruel and unusual punishment under the Eighth Amendment. ECF Nos. 27 at 12; 27-1 at 1-3. As discussed above, even construing the evidence in the light most favorable to Ingram, he has not shown deliberate indifference. Accordingly, his Motion for Summary Judgment will be denied.

supervisory prison officials are entitled to rely on professional judgment of trained medical

personnel and may be found to have been deliberately indifferent by intentionally interfering

with a prisoner's medical treatment ordered by such personnel).  Ingram does not allege that

Richardson intentionally hindered his medical treatment.[23]  Thus, there are no genuine issues of

material fact presented as to this claim and summary judgment will be granted in favor of

Richardson.

Ingram next faults Richardson for his allegedly wrongful placement in segregation lock-

up, stating "the institution is keeping me on disciplinary lock-up constantly." [24] (ECF 2, p. 6).

Under certain circumstances, restraint which imposes atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life may create liberty interests which are

protected by the Due Process Clause. *Sandin v. Conner*, 515 U.S. 472, 483-4 (1995) (stating

"these interests will be generally limited to freedom from restraint which, while not exceeding

the sentence in such an unexpected manner as to give rise to protection by the Due Process

Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life.").  Although the conditions of confinement in

disciplinary and administrative segregation are typically more burdensome than those imposed

on the general prison population, Ingram has provided no evidence that the conditions were so

atypical that exposure to them imposed a significant hardship in relation to the ordinary incidents

of prison life. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (placement in segregation

did not comparatively constitute the type of hardship necessary to give rise to a liberty interest).

---

[23] Ingram alleged in his initial letter to this court that a "Towson staff officer" was preventing him from seeing
medical personnel. (ECF 1, p. 1).  Ingram did not specify the date of the occurrence, the name of the officer, or the
nature of his need to see a medical officer. On May 2, 2014, Ingram was informed by Bruce D. Flanigan, Major,
Baltimore County Bureau of Investigation, that his general medical concerns would be investigated by James
Anzalone, Medical Liaison for the Baltimore County Department of Corrections.  (ECF 6-1).  The outcome of the
investigation was not included in the record.

[24] Ingram does not specify the dates of this allegedly improper placement.

Claims concerning conditions of confinement imposed upon pretrial detainees are examined under the Due Process Clause of the Fourteenth Amendment as opposed to the cruel and unusual punishment prohibition of the Eighth Amendment, which applies to convicted inmates. *Bell v. Wolfish*, 441 U.S. 520, 535–38 (1979).  As a pretrial detainee, a prisoner has a due process right against restrictions that amount to punishment. *Id.* at 535.  However, conditions of confinement that are imposed for, and reasonably related to, a legitimate government interest do not amount to punishment. *Id.* at 538–39. "[N]ot every hardship encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th. Cir. 1992)  (*citing Bell*, 441 U.S. at 537).

To establish that a condition or restriction of confinement is constitutionally impermissible "punishment," a pretrial detainee must show "either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (*citing Bell*, 441 U.S. at 538–40).   In determining whether the challenged conditions amount to punishment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given due deference. *See, Sandin* 515 U.S. at  482 (1995). In this case, Richardson has shown that Ingram's housing assignments were premised on the need to house him and other inmates safely and for disciplinary reasons. Ingram's assertions do not support a showing of constitutionally impermissible punishment.

Further, substantive due process is satisfied so long as the disciplinary hearing decision is based upon "some evidence." *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985).  A disciplinary hearing officer's findings of fact will be disturbed only when

unsupported by any evidence, or when wholly arbitrary and capricious. *Id.* at 456; *see also Baker v. Lyles,* 904 F.2d 925, 933 (4th Cir.1990). Ingram does not allege he was deprived of due process or his disciplinary hearings were improperly conducted. He received a hearing for each infraction of BCDC rules alleged against him. (ECF 37-4, p 8). Most important, he makes no claim or allegation of fact to demonstrate his confinement amounted to atypical hardship or he was denied his right to substantive due process. Ingram's sentence was not extended by BCDC as a result of any disciplinary action, and even when the facts are viewed in the light most favorable to him, there is no genuine issue of material fact presented. For these reasons, Richardson is entitled to summary judgment in her favor as to this claim.

Finally, Ingram faults Richardson for failing to protect him from other inmates. An inmate has an Eighth Amendment right to be protected from violence perpetrated by other prisoners. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014); *see Farmer v. Brennan*, 511 U.S. 825, 833–35 (1994). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer,* 511 U.S. at 833–34 (citations omitted). The Fourth Circuit has explained,

> An Eighth Amendment claim of this nature requires proof of two elements to establish deprivation of a constitutional right. [*Farmer*, 511 U.S.] at 834; *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010). First, a prisoner must establish a serious deprivation of his rights in the form of a "serious or significant physical or emotional injury."[ ] *Brown*, 612 F.3d at 723; *see also De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013). . . . The second element … requires that a plaintiff show that the prison official allegedly violating the plaintiff's constitutional rights had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted). In this context, the required state of mind that must be established is a "deliberate indifference to inmate health or safety." *Id.* (citations omitted).

18

*Danser,* 772 F.3d at 346.

 "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).

 "A failure-to-protect claim brought by a pretrial detainee constitutes a due process claim under the Fourteenth Amendment, but the same standards apply as for an Eight Amendment claim brought by a convicted prisoner." *King–Fields v. Leggett*, Civ. Action No. ELH–11–1491, 2014 WL 694969, at *10 (D.Md. Feb. 19, 2014); *Brown v.. Harris*, 240 F.3d 383, 388 (4th Cir. 2001).  In order to prevail on a claim of failure to protect from violence, a pretrial detainee must establish that a defendant exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir.1987).

 Richardson has filed affidavits and verified exhibits demonstrating that upon admission to BCDC, Ingram did not identify any enemies to corrections officials.  Moreover, Ingram does not dispute that once his conflicts with other inmates or potentially with gang members became known by corrections officers, "keep separate orders" were promptly issued and he was removed to protective custody, as appropriate. Ingram's generally stated and conclusory allegations concerning failure to protect him from harm fail to sustain his burden to set forth specific facts showing that there is a genuine issue for trial.  Thus, Richardson is also entitled to summary judgment as to this claim; to the extent Ingram seeks summary judgment against Richardson,[25] his motion will be denied.

---

[25] *See supra* note 18.

## CONCLUSION

For the foregoing reasons, Conmed's Motion to Dismiss, treated as a Motion for

Summary Judgment (ECF 24), will be granted, Richardson's Motion for Summary Judgment

(ECF 37) will be granted, and Ingram's Motions for Summary Judgment (ECF 27) and

Appointment of Counsel (ECF 34) will be denied.  Judgment will be entered in favor of Conmed

and Richardson and against Ingram.

_7/6/15_
Date

William D. Quarles, Jr.
United States District Judge

20